Filed 12/13/23 In re R.M. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re R.M. et al., Persons Coming Under the Juvenile Court Law. | D082110 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. Nos. J520333A-B) |
| Plaintiff and Respondent, | **REDACTED OPINION FOR PUBLIC VIEW\*** |
| v. | |
| R.W. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Alexander M. Calero, Judge. Affirmed.

Donna B. Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant R.W.

Pamela Rae Tripp, for Defendants and Appellants A.H. and L.H.

---

**\*** This case involves material from a sealed record. In accordance with Civil Code section 3426.5 and California Rules of Court, rules 8.45, 8.46(g)(1) and (2), we have prepared both public (redacted) and sealed (unredacted) versions of this opinion. We order the unredacted version of this opinion sealed.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Evangelina Woo, Deputy County Counsel, for Plaintiff and Respondent, San Diego County Health and Human Services Agency.

R.W. (Mother) appeals from the juvenile court's orders (1) denying her Welfare and Institutions Code[1] section 388 petition requesting that the juvenile court place her minor children, R.M. and Z.M., with maternal great-aunt and great-uncle, A.H. and L.H., and (2) terminating her parental rights pursuant to section 366.26. Co-appellants A.H. and L.H. appeal from orders summarily denying their requests for a relative placement hearing under section 361.3 and for an evidentiary hearing under section 388 regarding placement. We agree with the San Diego County Health and Human Services Agency (Agency) that the juvenile court did not abuse its discretion in denying the section 361.3 and 388 requests for hearing and did not err by finding the parental-benefit exception inapplicable to preclude the termination of Mother's parental rights. Therefore, we affirm.[2]

---

[1]    All further statutory references are to the Welfare and Institutions Code.

[2]    Because the juvenile court gave A.H. and L.H. access to only portions of the juvenile case file pursuant to section 827, the record on appeal includes redacted records. Accordingly, we have filed both a redacted and a sealed opinion. Our redacted opinion, which is part of the public record, does not include facts derived from the redacted portions of the record. Our unredacted, sealed opinion is filed concurrently with this redacted opinion.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Section 300 petitions and detention hearing*

[REDACTED]

At the April 1, 2020 detention hearing, the juvenile court detained the children away from Mother and found it would be detrimental to allow visitation.

B.    *Jurisdiction and disposition hearings*

[REDACTED]

Also in its report, the Agency listed A.H. and maternal great-uncle, L.H., as relatives of the children and indicated that it had contact with A.H., maternal grandmother and aunt, and paternal grandfather.  The report did not indicate which of the contacted relatives requested to be assessed for placement.

The Agency's addendum report indicated that it held a May 2020 child and family team meeting to discuss placement, visitation, and case plan services, among other topics.  Many of the children's family members attended, including Mother, maternal grandmother, A.H., and L.H.  The Agency's report outlined an action plan to include looking into clearing maternal grandmother for visitation and assessing A.H. for unsupervised contact with the children.  Maternal grandmother, maternal aunt, and A.H. then began virtual visits with R.M, who quickly lost interest during visits and would remember after visits that he was "not supposed to eat meat."

In mid-June 2020, A.H. submitted a letter to the juvenile court in which she asked the court to grant Mother visitation with the children and spoke positively of Mother, including describing the strong bond she observed between Mother and the children during their time living with A.H.

[REDACTED]

In July 2020, the foster family texted a photograph of Z.M. sitting in his new wheelchair to maternal grandmother and A.H., both of whom questioned his need for a wheelchair. A.H. asked if Z.M. still needed a wheelchair and stated that Z.M. "is determined, so I am very sure he will be walking on his own very soon. I know he will." These comments indicated to the Agency that the family viewed Z.M.'s condition to be caused by his bout with pneumonia rather than his life-long severe neglect and deprivation of nutrition and medical care. The Agency also found the comments concerning because three-and-a-half-year-old Z.M. had never walked or even crawled previously.

[REDACTED]

C.    *Reunification phase*

[REDACTED]

D.    *Permanency phase*

[REDACTED]  A.H. reported that she went through the RFA process previously but was not approved due to an individual residing in her home. She told the Agency she would be interested in placement but that the reason she was not previously approved continued to be a factor at the time of the Agency's addendum report. According to a later Agency report, A.H. and L.H. withdrew their initial RFA application but applied again in March 2022.

The court held a special hearing regarding placement on April 1, 2022 and received various reports into evidence, including the Agency's section 361.3 assessment of maternal grandmother. Mother, A.H., and the children's therapist testified in support of maternal grandmother. A.H. testified that, as of March 2020, the children had been living with her since January 2020,

left at some point, and then came back again in mid-February 2020. She testified that she was responsible for Z.M. going to the hospital in March 2020 because she had noticed him coughing a lot over a couple of weeks. Before taking him to the hospital, she did not have any concerns about Z.M.'s health and did not observe him to be near death. She did not believe R.M. needed medical attention during his stay with her but heard him mention that his legs hurt.

The children's therapist testified that it was generally best practice for adopted children to maintain access to their family of origin, but she could not speak to whether doing so was in Z.M.'s and R.M.'s best interests. She said that having an ongoing relationship with the biological family often supported a child's identity development in a transracial placement. She explained that a potential transracial placement existed in Z.M. and R.M.'s case because they were African-American while the foster family was Caucasian. At the hearing's conclusion, the juvenile court denied the request for placement with maternal grandmother and stated there were "other relatives being assessed at this time."[3]

[REDACTED] The Agency identified the foster family as the only prospective adoptive parents and explained that the foster family had been the children's only placement and that they looked to the foster family for comfort and to meet their daily needs. In the foster family's care, the

---

[3]    Mother appealed this order, alleging only that the juvenile court erred by finding the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.) inapplicable before the Agency had completed its initial and further inquiries into the children's possible Native American ancestry. We reversed the court's ICWA finding, remanded for the limited purpose of compliance with ICWA, and otherwise affirmed the placement order. (*In re R.M.* (Aug. 29, 2022, D080259) [nonpub. opn.].) Because the Agency and court's compliance with ICWA is not at issue in this appeal, we limit our discussion accordingly.

children continued to progress in addressing their past trauma [REDACTED] The Agency noted that A.H.'s RFA remained pending but opined that placement with A.H. was not in the children's best interests because of her pattern of minimizing the children's trauma. Although the Agency acknowledged and commended A.H. for initiating the children's medical care in March 2020, the Agency was concerned that she did not do so until the children were near death nearly four weeks after moving in with A.H.

At an April 6, 2022 hearing, the court ordered that the Agency continue to have discretion regarding visitation.

[REDACTED] A.H.'s RFA application was approved on August 31, 2022. The Agency notified A.H. of the approval on October 5, 2022 and explained the different permanent plans.

A.H. expressed that she and L.H. wanted the permanent plan of guardianship should the children be placed in their care. The Agency asked what stood out from guardianship over the other permanent plans, and A.H. responded, "If you want we can do adoption." The Agency stated, "No, I am here to support you in the decision you and [L.H.] make; it is what you all think is the best fitting plan for the children and yourselves." A.H. said, "Well, I think guardianship because we want to ensure they live healthy, happy lives and we are old. We can help them until they are 18 years of age, get them ready for adulthood." The Agency thanked them, provided a cellphone number, and asked A.H. and L.H. to remain in contact and to reach out, including by text, with any questions or concerns.

At an October 10, 2022 hearing, Mother's counsel represented for the first time that A.H. had "been requesting placement since the initial hearing." She asked to confirm Mother did not need to file a section 388

6

requesting placement with A.H. because her counsel believed *Isabella G.*[4] applied. The Agency disagreed that *Isabella G.* applied, noting it was unclear when A.H. had first requested placement and that the Agency did not yet have a position on whether it would recommend placement with her.

[REDACTED]

The Agency's report also detailed the children's October 2022 visit with A.H. and L.H., during which the children opened gifts, played on the swings, and enjoyed counting for A.H. and L.H. When asked by the social worker if they wanted another visit with A.H. and L.H., the children both shouted, "Yes!" The Agency later gave A.H. and L.H. additional information on the permanent plan options, and A.H. said she had previously adopted but wanted to seek legal advice before deciding. [REDACTED]

As to placement, the Agency continued to recommend that the children remain with the foster family, with whom they had lived the last two years and eight months. Both children were thriving in the foster parents' care and progressing in all areas of development, despite their serious and life-threatening health conditions at the beginning of the dependency. The foster parents had taken the children to all of their necessary medical, dental, and therapeutic appointments, and the Agency noted that several of the children's service needs would likely continue throughout their lives. The Agency opined that the benefit to the children of remaining in their current placement significantly outweighed disruption to that placement.

---

4    In *In re Isabella G.* (2016) 246 Cal.App.4th 708, we held that when a relative made a timely request for placement of a dependent child and the agency failed to properly respond to that request, the section 361.3 relative placement preference applied even after reunification services had been terminated.

In a November 2022 report, the Agency noted that A.H. and L.H. expressed interest in placement at the beginning of the case but withdrew their RFA application. A.H. and L.H. then reapplied in March 2022 and were approved for placement on August 31, 2022. The Agency remained concerned about placement with A.H. and L.H. because of A.H.'s pattern of minimizing the children's trauma and because A.H. did not seek medical care for the children until nearly three months after they began living with her and L.H. [REDACTED]

A.H. attended a November 8, 2022 hearing at which the Agency stated it needed to prepare a section 361.3 analysis of the relatives requesting placement.

On January 12, 2023, Mother filed a section 388 petition asking for a two to three month continuance to allow A.H. and L.H. to obtain counsel for the section 366.26 hearing. Mother's petition indicated that circumstances changed because A.H. and L.H. received notice on September 6 of their RFA approval, and placing the children with A.H. and L.H. was in the children's best interests because they routinely told the social worker they wanted to be "with family."

Mother attached to her section 388 petition A.H. and L.H.'s RFA approval, the Agency's September 6, 2022 letter notifying A.H. and L.H. of their RFA approval, and an affidavit signed by A.H. and L.H. and dated January 13, 2023 to "provide a timeline of [A.H. and L.H.'s] interactions with [the Agency]" and to address the Agency's concerns that they were "not a viable fit to adopt [the children]." A.H. and L.H.'s affidavit stated that Mother and the children stayed with A.H. and L.H. from February 15, 2020 through March 1, 2020 for "[a]pprox[imately] 2 weeks," left, and then returned to their home from March 4 through March 16, 2020

8

"[a]pprox[imately] 12 days."  On March 18, 2020, Mother and the children returned that evening to stay with A.H. and L.H.  The next day, they had a family meeting with Mother about taking Z.M. to the doctor because he was "doing too much coughing."  The affidavit did not indicate when A.H. and L.H. first requested placement or filed and/or withdrew their RFA.

At a January 18, 2023 hearing, Mother requested placement with A.H. and L.H and requested a continuance to allow A.H. and L.H. to retain counsel because they were "under the impression that they would be getting placement of the [children] and only found out recently that they were going to be denied placement."  The next week, A.H. and L.H.'s counsel petitioned for access to the children's case files under section 827, which the court granted in early March 2023.

The Agency submitted a section 361.3 analysis of A.H. and L.H. on February 15, 2023, again recommending that the children remain in their placement with the foster family.  Although various section 361.3 factors weighed in favor of placement with A.H. and L.H., the Agency believed it was in the children's best interests to remain in their current placement rather than being moved to A.H. and L.H.'s home.  The Agency explained that A.H. and L.H. had historically placed Mother's needs over the children's needs by focusing only on Mother's reunification efforts and minimizing the damage Mother caused the children.  The Agency acknowledged that A.H. and L.H. appeared appropriate and a viable placement but stated that their actions historically had shown otherwise, and the Agency was uncertain that should new issues arise with the children, A.H. and L.H. would seek the necessary interventions and accept help for the children.  The Agency noted the significant progress the children had made in the foster family's care

9

compared to their malnourished and dying states while living with A.H. and L.H.

E.     *Combined contested section 366.26, 388, and 361.3 hearing*

At the May 2 and 3, 2023 combined contested section 366.26, 388, and 361.3 hearing,[5] Mother orally amended her prior section 388 petition to: (1) request that the court place the children with A.H. and L.H., (2) reflect that the children asked to be placed with A.H. and L.H., and (3) reflect that Mother's expert would testify that placement with family was the best placement to minimize the risk of trauma to the children. The Agency and minors' counsel argued that given the children's special needs and the entire case history, Mother did not make a prima facie case showing that a change in placement would be in the children's best interests.

After hearing argument, the juvenile court acknowledged that section 388 petitions are to be construed liberally in favor of sufficiency and found there was a change of circumstances due to A.H. and L.H.'s RFA approval, but the court also found that placing the children with A.H. and L.H. was not in the children's best interests and denied the section 388 petition. The juvenile court noted that the children lived with A.H. and L.H. for three months before being taken into protective custody, the children had extensive medical needs, it was unclear whether A.H. and L.H. understood the significance of those needs, and there was no information in the Agency's reports indicating that A.H. and L.H. were involved with the children's medical needs. The Agency's counsel clarified that it believed the court was relying in part on A.H. and L.H.'s affidavit, which provided that the children

---

[5]     The juvenile court received into evidence the Agency's reports dated April 6, 2022; June 10, 2022; October 10, 2022; November 8, 2022; February 15, 2023; and May 2, 2023.

stayed with A.H. and L.H. for a two-week period in February 2020 and a 12-day period in March 2020 before A.H. intervened to obtain medical care for the children. The court confirmed that it relied on that information in making its finding.

Following the court's section 388 ruling, A.H. and L.H.'s counsel asked the court to place the children with A.H. and L.H. pursuant to section 361.3. He argued that A.H. and L.H. had made themselves available since the beginning of the case and requested RFA approval. He stated that A.H. and L.H. were told to withdraw their RFA request because of an unapproved resident in their home, and their RFA request was subsequently reinstated once the relative moved out. He then asserted that the Agency misled A.H. and L.H. by waiting until November 2022 to tell them they would not be getting placement. He stated, "Perhaps they were even misled to withdraw their first [RFA] request, but I'm going to need to put them on the stand and establish that . . . ." He went on to state that his clients were "not allowed to write reports like the Agency, and a lot of the information in the Agency's report is not accurate," including that Mother lived with A.H. and L.H. for three months, which was "blatantly not true." A.H. and L.H.'s counsel asked the court to grant a section 361.3 hearing by finding they had proffered evidence the Agency misled A.H. and L.H. into withdrawing their RFA request.

The Agency opposed the request for a section 361.3 hearing and argued *Isabella G.* did not apply because there was no evidence the Agency misled or told A.H. and L.H. to withdraw their RFA application and wait to reapply. The Agency argued that A.H. "ha[d] been around," including attending court hearings throughout the reunification period and testifying on behalf of maternal grandmother's request for placement. A.H. and L.H. were notified

11

at the beginning of the case that they could apply to request placement, and they were assessed and either withdrew their RFA or were denied; they did not reapply until after reunification was over.

The juvenile court found the Agency did not fail to meet its statutory obligation to consider and investigate A.H. and L.H. for placement and did not ignore or disregard them; thus, *Isabella G.* did not apply. For that reason, it concluded that section 388 was the proper procedure to consider a relative for placement under section 361.3 and that it was the relatives' burden. Having denied Mother's section 388 petition, the court likewise denied A.H. and L.H.'s request for a section 361.3 hearing.

A.H. and L.H.'s counsel then orally requested that the children be placed with A.H. and L.H. pursuant to section 388, reiterating his earlier argument that A.H. and L.H.'s RFA approval constituted a change of circumstance. As to best interests, he argued that A.H. and L.H. would testify indicating their involvement with the children's lives throughout the dependency case, that they visited with the children, that the children tell A.H. and L.H. that they want to live with them, and that A.H. and L.H. are capable of maintaining the children's medical treatments and services. He further argued that he would provide expert testimony that placing children with a relative can alleviate many of the traumas associated with adoption.

The court denied A.H. and L.H.'s section 388 request. The court explained that it was familiar with the research on the benefits of relative placement and acknowledged A.H. and L.H.'s care and concern for the children. But the court found it would not be in the children's best interests to place them with A.H. and L.H. The court observed that because A.H. and L.H. saw the children shortly before they were placed in protective custody, the court could conclude A.H. and L.H. were aware of the children's condition

12

but did not take action. The court observed that family dynamics could be complicated but that it was concerned A.H. and L.H. did not protect the children at that time. The court further stated that the children had ongoing medical issues requiring years of future treatment but that it was unclear whether A.H. and L.H. appreciated the burden of those medical appointments and care that the children would continue needing. Finally, the court stated its concern that moving the children at this point would create additional trauma for the children when considering the extended period of time that they had lived with the foster family.

The court next turned to the section 366.26 portion of the hearing and heard testimony from the Agency's protective services worker A. Salazar. Salazar observed 22 visits and acknowledged that Mother's visitation was consistent overall. She opined that R.M. exhibited parentified behaviors, including often putting Mother's needs before his own and worrying about her being alone. Meanwhile, Z.M. presented "more of testing limits" with Mother with "more emotion built up." Salazar stated that the children became upset when Mother was late to visits, which Salazar attributed to the anticipation of not knowing and the unknown—a significant trigger for them. She thought the children's dysregulation after visits with Mother was similarly related to "the unknown," including the children not knowing what their permanent plan would be. She further testified that when Mother missed calls or visits, the children did not ask for her and it was "kind of like out of sight, out of mind." Salazar acknowledged that a significant number of the children's most recent park visits involved them sitting on a bench with Mother and playing with their iPads.

Next, Dr. Elizabeth Stanton, whom the court designated as an expert in attachment theory, testified for Mother. To prepare her bonding study, which

13

the court admitted into evidence, Dr. Stanton reviewed the dependency petition and observed a four-hour visit between Mother and the children at Chuck E. Cheese. She did not review any of the Agency's reports, did not interview the children, did not speak with the social worker, did not observe the children with the foster parents, and did not interview the children after their visit with Mother at Chuck E. Cheese. Dr. Stanton was unaware that the children often appeared dysregulated, had bathroom accidents, and used physical aggression with one another after visits with Mother. She testified that she could only consider what she, herself, had observed in opining on the children's attachment with Mother.

Based on Dr. Stanton's observations of the children's and Mother's interactions during the Chuck E. Cheese visit, Dr. Stanton concluded the children had a substantial positive attachment to Mother. She testified there was a risk the children would suffer if they were not allowed visits with Mother, but she could not say whether that risk was big or small. She also testified there was a "variety of reasons" why children might act out after a visit, including that the children were responding negatively to the separation from the parent because of a healthy bond they had.

After hearing argument and considering the evidence, the juvenile court found the children specifically adoptable. Turning to the parental-benefit exception, the juvenile court found Mother regularly visited and contacted the children. But it found Mother did not carry her burden to prove the children had a substantial, positive, and emotional attachment to her. Specifically, the court observed that R.M. showed parentified behavior and that Z.M. challenged Mother. It also considered various factors, including the children's young age at removal from Mother, the three years they had been outside Mother's care and with the foster family, their

14

dysregulation after visits with Mother, and the ease with which they were redirected when Mother's visits were canceled.

The court next found that, even assuming a beneficial relationship existed between Mother and the children, the benefits of adoption, including stability, outweighed any detriment caused by the loss of the relationship with Mother. The court terminated parental rights and freed the children for adoption.

## II.

## DISCUSSION

A.    *The court did not abuse its discretion in denying A.H. and L.H. a hearing on their request for placement and section 361.3 preferential consideration*

A.H. and L.H. contend they were entitled to a hearing and preferential consideration for placement under section 361.3. We disagree.

After a child is removed from parental custody, section 361.3, subdivision (a) requires that "preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative[.]" The statute defines "preferential consideration" to mean "the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).) "The intent of the Legislature is 'that relatives be assessed and *considered* favorably, subject to the juvenile court's consideration of the suitability of the relative's home and the best interests of the child.'" (*Isabella G., supra*, 246 Cal.App.4th at p. 719.)

The plain language of section 361.3 "provides for preferential consideration of a relative's request for placement of a child with the relative early in dependency proceedings, *before* the disposition order." (*In re J.Y.* (2022) 76 Cal.App.5th 473, 477, italics added.) Courts have held, however, that the section 361.3 relative placement preference may apply, even after

15

the reunification period, "where the relative has made a timely request for placement during the reunification period and the child welfare agency has not met its statutory obligations to consider and investigate the relative seeking placement." (*In re Maria Q.* (2018) 28 Cal.App.5th 577, 595.)

In *Isabella G.*, for example, we held "that when a relative requests placement of the child prior to the dispositional hearing, and the Agency does not timely complete a relative home assessment as required by law, the relative requesting placement is entitled to a hearing under section 361.3." (*Isabella G., supra*, 246 Cal.App.4th at p. 712.) In *Isabella G.*, the grandparents requested placement before the detention, jurisdictional, and dispositional hearings. (*Id.* at p. 722.) The agency did not conduct a home assessment of the grandparents and erroneously told them the child's placement could not be changed for a year. (*Id.* at pp. 722–723.) Relying on this misrepresentation, the grandparents waited a year before requesting placement again, shortly before the 12-month review hearing. (*Ibid.*) When the agency still did not assess the grandparents' home for placement, the grandparents again requested placement after the court terminated reunification and set a section 366.26 hearing. After the grandparents retained counsel and filed a section 388 petition, the agency finally conducted a home assessment and approved the placement in less than three weeks. (*Isabella G.*, at p. 723.) Under the facts of *Isabella G.*, we concluded the court prejudicially erred in not evaluating the grandparents' timely request under section 361.3. (*Isabella G.*, at pp. 723–725.)

A.H. and L.H. argue that like the grandparents in *Isabella G.*, they were entitled to a section 361.3 hearing and preferential consideration for placement because they sought placement at the beginning of the case in 2020, but the Agency delayed preparing a section 361.3 report for over a year.

16

We disagree and conclude *Isabella G.* does not apply because the record does not show any delay or misleading by the Agency. Rather, the record shows the Agency notified A.H. and L.H. at the beginning of the case that they could apply to request placement, and A.H. and L.H. applied at some point but either withdrew their RFA or were denied. A January 2022 addendum report similarly indicates that A.H. said she went through the RFA process previously but was not approved due to an individual residing in her home, which she said was still a factor as of the January 2022 report. A later Agency report likewise indicates that A.H. and L.H. had withdrawn their initial RFA application but reapplied in March 2022—months after the court terminated reunification services. And A.H. and L.H.'s affidavit, which they filed to "provide a timeline of [their] interactions with [the Agency]," does not specify when they first requested placement or support their delay theory. Further, as the Agency contends, even assuming that A.H. and L.H. requested placement *before* the March 5, 2021 disposition hearing, the record shows they were informed they could not be approved because of an individual residing in their home, which A.H. acknowledged "continue[d] to be a factor" in January 2022 when she told the Agency she remained interested in placement.

We are unpersuaded that, as A.H. and L.H. contend, they were kept in the dark or deceived by the Agency. Instead, the record is replete with evidence of A.H.'s ongoing and often active participation in the dependency proceedings. A.H. attended a child and family team meeting for the children at which RFAs for other individuals were discussed. She had video visits with the children and attended numerous court hearings before the court terminated reunification services. She testified at a section 361.3 hearing in support of the children's placement with maternal grandmother. And she

17

filed documents in Mother's support.  Thus, on this record, which does not show the Agency failed to meet its statutory obligation to consider and investigate A.H. and L.H. for placement, we see no error in the juvenile court's finding that A.H. and L.H. were not entitled to a section 361.3 hearing and preferential consideration under *Isabella G.*

Moreover, even assuming that the juvenile court erred by denying A.H. and L.H. a section 361.3 hearing and preferential consideration, we conclude any error was harmless because of the juvenile court's finding that it was not in the children's best interests to place them with A.H. and L.H.  The preferential consideration under section 361.3 "does not create an evidentiary presumption in favor of a relative, but merely places the relative at the head of the line when the court is determining which placement is in the child's best interests." (*In re Sarah S.* (1996) 43 Cal.App.4th 274, 286.)  The California Supreme Court has likewise explained that "regardless of the relative placement preference, the fundamental duty of the court is to assure the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 321 (*Stephanie M.*).)

Here, and consistent with the Agency's recommendation in its section 361.3 assessment of A.H. and L.H., the juvenile court found that moving the children to A.H. and L.H.'s home would not be in the children's best interests for various reasons.  The court considered the extended period of time during which the children had lived and thrived with the foster family, A.H. and L.H.'s history of minimizing the harm Mother caused the children, A.H. and L.H.'s delay in seeking treatment for the children while they lived together, the extent of the children's ongoing medical and care needs that the court was uncertain A.H. and L.H. appreciated, and the court's concern that A.H.

18

and L.H. would not take necessary action to protect and seek help for the children in response to future issues. Accordingly, error if any was harmless.

B. *The court did not abuse its discretion by denying A.H. and L.H.'s section 388 request to modify placement*

In the alternative, A.H. and L.H. argue they were entitled to an evidentiary hearing regarding their section 388 request to modify the children's placement. We again disagree.

Section 388 allows "[a]ny . . . person having an interest in a child" in a dependency proceeding to petition the juvenile court to modify a placement order due to changed circumstances or new evidence at any time after the child has been declared a dependent. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) The petition must "set forth in concise language any change of circumstance or new evidence that is alleged to require the change of order." (§ 388, subd. (a)(1).) "If it appears that the best interests of the child . . . may be promoted by the proposed change of order . . . , the court shall order that a hearing be held." (§ 388, subd. (d).)

The juvenile court must liberally construe a section 388 petition in favor of its sufficiency for the granting of an evidentiary hearing. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309 (*Marilyn H.*).) Accordingly, the petitioner need not show a probability of prevailing on the petition at a full hearing. (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432.) Rather, to trigger the evidentiary hearing requirement, the petitioner need only make a prima facie showing of changed circumstances or new evidence and that the proposed modification would be in the child's best interests. (*Marilyn H.*, at pp. 309–310.) In evaluating a section 388 petition, the juvenile court may consider the evidence in the record as a whole. (*In re J.M.* (2020) 50 Cal.App.5th 833, 847.) Like a denial after a full evidentiary hearing, a

19

summary denial of a section 388 petition is reviewed for abuse of discretion. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 460.)

A.H. and L.H. contend the juvenile court abused its discretion by summarily denying their section 388 petition without an evidentiary hearing. Because there is no dispute that they made a prima facie showing of changed circumstances—their August 2022 RFA approval—our review turns on whether they made a prima facie showing that the requested placement was in the children's best interests. We see no abuse of discretion in the court's finding that they did not.

A.H. and L.H. assert their affidavit and the Agency's section 361.3 report constituted a prima facie showing that placing the children with them was in the children's best interests. We are unpersuaded. First, A.H. and L.H.'s affidavit only confirmed the timeline for the juvenile court from which it found A.H. and L.H. were aware of the children's concerning health conditions but waited to seek medical attention for them. Although the affidavit makes clear that A.H. and L.H. love and care for the children and were responsible for persuading Mother to seek medical care, the affidavit also makes clear that A.H. and L.H. were aware of Z.M.'s concerning health as early as February 15, 2020, when, as their affidavit admits, "[t]his [wa]s when [they] really started noticing [Z.M.'s] health condition." Yet, as the juvenile court noted, Z.M. did not receive medical care until over a month later. Thus, we see no abuse of discretion in the court's concern that A.H. and L.H. might not seek help for the children when issues arose in the future. And we see no abuse of discretion in the court's finding that it would not be in the children's best interests to remove them from the foster family's home, where they were thriving and recovering.

A.H. and L.H. further contend the Agency's section 361.3 report weighed in favor of placement with them. It is true the report's relative placement factors stated that A.H. and L.H. had expressed their desire to provide a loving and stable home for the children, properly and effectively care for them, provide stable housing, put the children's needs over the parents' needs, create healthy boundaries with Mother while wanting to continue contact with her, ensure the children continued with their services, and provide permanency for the children. Indeed, A.H. and L.H. are to be commended for their ongoing involvement in the children's dependency case and their love for the children. However, A.H. and L.H. disregard (1) the report's numerous stated concerns about whether they would satisfy those promises and (2) the report's ultimate conclusion that placement with them would *not* be in the children's best interests. For example, throughout the report, the Agency repeatedly expressed its concerns regarding A.H. and L.H.'s history of placing Mother's needs over the children's needs and minimizing the damage Mother had caused the children. The report discussed how well the children were doing in the foster family's care and the children's likely increasingly complex needs in the future, which the Agency believed the foster family was better equipped to support. It noted concerns that A.H. and L.H. would permit Mother to return to their home and care for the children, particularly where A.H. had historically "rallied around" Mother and supported her reunification efforts, including by creating a Go Fund Me account to raise funds for private counsel.

Thus, we again see no abuse of discretion, particularly when considering the factors before the juvenile court indicating that placement with A.H. and L.H. was not in the children's best interests: the lengthy period during which the children had lived and thrived with the foster family, A.H.

21

and L.H.'s history of minimizing the harm Mother caused the children, A.H. and L.H.'s delay in seeking treatment for the children while they lived together, the children's ongoing medical and care needs of which the court was uncertain A.H. and L.H. appreciated, and the court's concern that A.H. and L.H. would not take the necessary actions to protect and seek help for the children if issues arose in the future.

A.H. and L.H. adopt Mother's argument that her section 388 petition presented a prima facie showing that placing the children with A.H. and L.H. was in the children's best interests.[6] They contend Mother would have provided evidence from her bonding study expert, which her counsel explained during the section 388 hearing would include testimony about the traumas caused by adoption and the "general advantages" of placing foster children with biological relatives. However, when considering this offer of proof—regarding the *general* benefits of placing children with biological kin—with the other previously-discussed evidence, we see no abuse of discretion.

A.H. and L.H. additionally argue that their affidavit presented an evidentiary conflict "critical" to deciding placement and therefore warranted an evidentiary hearing. Specifically, their affidavit discussed a two-week period in February 2020 and a 12-day period in March 2020 during which the children lived with them. In contrast, an Agency report stated the children lived with A.H. and L.H. over a three-month period before receiving medical care. At the hearing, however, the juvenile court clarified that it was relying on the shorter periods of time in A.H. and L.H.'s affidavit, not that the children lived with A.H. and L.H. for the entire three-month period referenced in the Agency's report. Thus, we disagree that any critical

---

[6] Because A.H. and L.H. adopt these arguments as their own, we refer to them as A.H. and L.H.'s arguments, rather than as Mother's.

evidentiary conflict existed warranting a hearing.  (Cf. *In re Clifton V.* (2001) 93 Cal.App.4th 1400, 1403–1405 [where court's ruling relied on agency report and grandmother's declaration which directly contradicted mother's claims regarding the frequency of her visitation and bond with the minor, court abused discretion by failing to permit mother to cross-examine grandmother and social worker during section 388 hearing].)  For the same reason, we disagree with A.H. and L.H.'s contention that by not being permitted to present and cross-examine witnesses regarding this conflict, Mother was denied due process.  Considering that the court's ruling relied on A.H. and L.H.'s own affidavit, we see no critical evidentiary conflict requiring a hearing.

C.      *Mother lacks standing to challenge the court's placement orders*

Mother similarly challenges the juvenile court's order denying her section 388 petition requesting that the children be placed with A.H. and L.H., and she joins A.H. and L.H.'s arguments regarding placement.  We need not address Mother's arguments, however, because we conclude she lacks standing to make them.

Mother concedes that her standing to appeal the court's placement orders is affected by the termination of her parental rights, but she contends that she nonetheless has standing because she also appeals from the order terminating her parental rights.  We disagree.  Appealing from an order terminating one's parental rights does not, on its own, confer standing on the parent to appeal from placement orders.  As the California Supreme Court has explained, "A parent's appeal from a judgment terminating parental rights confers standing to appeal an order concerning the dependent child's placement *only if* the placement order's reversal advances the parent's

23

argument against terminating parental rights." (*In re K.C.* (2011) 52 Cal.4th 231, 238, italics added.)

Here, Mother does not explain nor even argue how reversing the juvenile court's placement decisions would have changed the court's ultimate decision to terminate her parental rights. And that is what is legally required to show standing. (*In re Cody R.* (2018) 30 Cal.App.5th 381, 390.)

D.     *The court did not err in terminating Mother's parental rights*[7]

Finally, Mother argues the juvenile court erred by finding the parental-benefit exception did not apply to preclude termination of her parental rights. On this record, we have little difficulty concluding this was not error.

Where, as here, "a court proceeds to select a permanent placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental rights in certain circumstances defined by statute. One of these is the parental-benefit exception. What it requires a parent to establish, by a preponderance of the evidence, is that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 629 (*Caden C.*); see § 366.26, subd. (c)(1)(B)(i) [providing in part that the court shall terminate parental rights unless "[t]he court finds a compelling reason for determining

---

[7]     We note that before serving A.H. and L.H. with their briefs on appeal, the Agency and Mother redacted portions of those briefs regarding the section 366.26 hearing and the court's order terminating Mother's parental rights. We see no basis for fully redacting this portion of our opinion, however, because it is clear that A.H. and L.H.'s counsel had access to the section 366.26 hearing transcripts. Indeed, A.H. and L.H.'s counsel cited portions of the hearing transcript in a motion to augment filed with this court; A.H. attended the section 366.26 hearing; and the juvenile court's section 827 order did not expressly prohibit A.H. and L.H. from accessing transcripts for hearings that either of them attended personally or through counsel.

24

that termination would be detrimental to the child due to . . . [t]he parents hav[ing] maintained regular visitation and contact with the child and the child would benefit from continuing the relationship"].) However, when the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption. (*Caden C.*, at p. 634.)

We apply a hybrid standard of review on appeal. (*In re J.C.* (2014) 226 Cal.App.4th 503, 530–531.) We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of the parental-benefit exception, for substantial evidence. (*Caden C., supra*, 11 Cal.5th at pp. 639–640.) As a reviewing court, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists. (*Id.* at p. 640.) We review for abuse of discretion the juvenile court's finding that the termination of parental rights would not be detrimental to the child. (*Ibid.*) A court abuses its discretion "by making an arbitrary, capricious, or patently absurd determination." (*Id.* at p. 641.)

The first element required for the parental-benefit exception to apply—regular visitation and contact—is "straightforward," and "[t]he question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C., supra*, 11 Cal.5th at p. 632; § 366.26, subd. (c)(1)(B)(i).) Here, the juvenile court found, and substantial evidence shows, that Mother had regular and consistent visits and contact with the children throughout the dependency. (§ 366.26, subd. (c)(1)(B)(i); *Caden C.*, at p. 636.) The parties do not dispute that Mother satisfied this

first element. Nor do they dispute on appeal the juvenile court's finding that the children were specifically adoptable.

As to the second element—the existence of a beneficial parent-child relationship—the juvenile court must "consider the evidence showing whether the parent's actions or inactions 'continued or developed a *significant, positive, emotional attachment* from child to parent.'" (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230, italics added.) Factors relevant to this determination include the age of the child, the amount of time the child spent in the parent's custody, the interaction between parent and child, and the child's needs. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The court should also examine "how children feel about, interact with, look to, or talk about their parents." (*Ibid.*)

Here, the court acknowledged that Mother and the children had "an attachment," but it stopped short of finding the attachment was a significant, positive, and emotional one. Although the children generally enjoyed spending time with Mother and expressed love for her, the record also shows the children were able to leave visits without incident and did not appear to experience any negative effects when Mother's visits were canceled. As the social worker put it, when Mother did not contact the children, it was a matter of "out of sight, out of mind." Further, some of the children's more recent park visits with Mother involved them sitting on a bench with her and playing with their iPads.

The evidence also showed the minors frequently experienced dysregulation after visits with Mother, including bedwetting [REDACTED] and difficulty sleeping, which led the Agency to reduce Mother's visits. Although Mother complains about the juvenile court's reading of the evidence in this manner, rather than accepting Dr. Stanton's alternative explanations

26

for the children's dysregulated behavior, it was no abuse of discretion. (*Caden C.*, *supra*, 11 Cal.5th at p. 640 [the reviewing court does " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' "].) Finally, and as the court properly considered, the children had lived with the foster family for approximately three years—a significant portion of their young lives when considering that R.M. was only five years old at the time of removal and Z.M. was three. Substantial evidence supported the court's finding that Mother and the children lacked a beneficial parent-child relationship.

Mother views the record differently. She complains the court did not discuss Dr. Stanton's testimony or the positive reports from the social worker, and she contends that Dr. Stanton's testimony was the only expert testimony at the hearing. We find these arguments unpersuasive. In fact, the juvenile court expressly considered Dr. Stanton's opinion that a substantial, positive, emotional attachment existed, but the court observed that Dr. Stanton's conclusion was based on observing only a four-hour visit between Mother and the children while the social worker's contrary assessment was based on over 22 hours of visitation observation and interviews with the minors and other individuals. Dr. Stanton conceded that her opinion was based only on reviewing the dependency petitions and observing the four-hour visit; she was unaware of the children's dysregulated behaviors after visits, did not observe the children after the four-hour visit, and did not speak with the children. Thus, the court's decision to give greater weight to the social worker's assessment than Dr. Stanton's was not error. (See *In re Luke M.* (2003) 107 Cal.App.4th 1412, 1427 ["Social workers are frequently recognized as experts in assessing risk and placement of children and selecting permanent plans for children."].) Moreover, as a reviewing court, we do " 'not

27

reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

The remainder of Mother's arguments similarly and impermissibly require reweighing the evidence in her favor, rather than in favor of the court's findings. For example, Mother asserts there was no evidence that she was on drugs or that she insulted or ignored the children at visits. But such evidence is not required, and it is *her* burden, not the Agency's, to establish that the parental-benefit exception applies. As discussed above, the record is replete with evidence supporting the juvenile court's finding that the children lacked the required significant, positive, emotional attachment for the parental-benefit exception to apply. (See, e.g., *In re Dakota H.* (2005) 132 Cal.App.4th 212, 229 [a parent must demonstrate something "more than frequent and loving contact, an emotional bond with the child, or pleasant visits"]; *In re Angel B.* (2002) 97 Cal.App.4th 454, 468 ["the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt"].)

[REDACTED] he [Z.M.] also asked when he could change his last name to the foster family's. The juvenile court was not required to discuss every piece of evidence it considered in making its findings. Regardless, we review the juvenile court's findings for substantial evidence in the record, which we conclude supports the court's finding here that the children and Mother lacked a beneficial parent-child relationship.

Finally, even assuming there was a beneficial parent-child relationship between Mother and the children, we nevertheless conclude the juvenile court did not abuse its discretion by finding that the benefits offered by adoption outweighed any detriment caused by terminating her parental

rights. Despite Mother's emphasis on Dr. Stanton being the only expert, Dr. Stanton's testimony regarding detriment was limited to opining that generally, terminating a secure attachment can cause a risk for destabilization to a child. Yet, Dr. Stanton could not say if that risk was big or small and did not opine on whether the children in *this case* would suffer detriment.[8] She also did not opine on whether such a risk outweighed the benefits of adoption. Indeed, Mother did not present evidence that the children would be greatly harmed by severing her relationship with them, or that the security and stability of adoption would not outweigh the loss of this relationship. (*Caden C., supra,* 11 Cal.5th at p. 633.) Meanwhile, the Agency's reports discussed the stability provided by the children's placement with the foster family and the significant physical and emotional progress they made in the foster family's care. Thus, we conclude there was no abuse of discretion.

---

[8]    In an undeveloped argument, Mother also appears to contend that the children, who are African-American, will experience detriment due to their potential adoption by a Caucasian family, and thus, guardianship—instead of adoption—would help mitigate that detriment because the children would have contact with their biological family. On this record, however, there is scant evidence that *these* children had previously or would in the future suffer detriment due to their placement with and potential adoption by a Caucasian family. Moreover, Mother points to no evidence that the juvenile court, in analyzing the parental-benefit exception, failed to consider the children's identity development in determining that the benefits of adoption outweighed any possible detriment to the children.

## DISPOSITION

The orders are affirmed.

IRION, J.

WE CONCUR:

McCONNELL, P. J.

HUFFMAN, J.